**HEALTH–CHEM CORPORATION, Plaintiff,**

v.

**Leon C. BAKER, Defendant and Counterclaim Plaintiff,**

v.

**HEALTH–CHEM CORPORATION, Counterclaim Defendant,**

**and**

**Marvin M. Speiser and The Bank of New York Co., Inc., Additional Defendants On Counterclaims.**

No. 88 Civ. 5605 (KTD).

United States District Court, S.D. New York.

Feb. 26, 1990.

Fried, Frank, Harris, Shriver & Jacobson, New York City, for plaintiff; Allen Kezsbom, of counsel.

Keck Mahin Cate & Koether, New York City, for defendant and counterclaim plaintiff Leon C. Baker; Mathew E. Hoffman, of counsel.

Shea & Gould, New York City, for additional defendants on counterclaims Marvin M. Speiser and The Bank of New York Co., Inc.; Mitchell J. Geller, of counsel.

## MEMORANDUM AND ORDER

### KEVIN THOMAS DUFFY, District Judge:

Rifts among directors of a corporation are not infrequent. Nor is it uncommon for such disputes to lead to protracted, often vitriolic, legal proceedings. As such, this action, which arises out of a written "Settlement Agreement" purporting to resolve differences between bickering directors of the plaintiff Health–Chem Corporation ("Health–Chem"), is not unusual. What distinguishes it from similar cases is that it reflects, in microcosm, the staggering effects of "Black Monday", October 19, 1987. On that date, the stock market saw a precipitous fall in the Dow Jones industrial average of over 500 points—its worst drop ever. The effects of that drop, which saw a concomitant fall in price of Health–Chem stock, led Health–Chem to bring this action seeking a declaration that the Settlement Agreement between the parties is invalid and must be renegotiated.

Defendant and counterclaim plaintiff Leon C. Baker moves pursuant to Fed.R.Civ.P. 56 for summary judgment dismissing the complaint and granting Baker's counterclaims against Health–Chem and counterclaim defendant Marvin M. Speiser. Health–Chem opposes the summary judgment motion and moves to amend its complaint pursuant to Fed.R.Civ.P. 15. Speiser cross-moves pursuant to Fed.R.Civ.P. 56 for summary judgment dismissing Baker's fourth counterclaim as against Speiser individually.

### FACTS

Health–Chem is a public company whose shares are traded on the American Stock Exchange. Baker is a former general counsel and director of Health–Chem, and directly or indirectly holds over one million of Health–Chem's common shares. Speiser is the Chairman of the Board of Directors and President of Health–Chem. Baker and Speiser are the two largest individual stockholders of Health–Chem.

On March 29, 1987, Health–Chem, Speiser, and Baker entered into an Outline of Settlement (the "Outline") that settled ongoing litigation between them. The Outline provided that it "will be incorporated into a definitive agreement to be negotiated and executed among the parties as soon as possible." Baker Affid. in Support of Summary Judgment, Exh. B. Under the Outline, Baker agreed to sever his relationship with Health–Chem and, among other things, to the sale of all of his Health–Chem common shares and the liquidation of Health–Med Corporation, a subsidiary of Health–Chem in which Baker had a minority interest. Outline of Settlement, Baker Affid. in Support of Summary Judgment, Exh. B ¶¶ 1, 2.[1] Health–Chem was given the right to sell Baker's shares any time after August 1, 1987, and throughout the 13–month sale period ending August 31, 1988. Health–Chem also agreed to deliver to Baker a bank letter of credit for $16,303,849, providing that upon Baker's de-

1. References to the Outline of Settlement will hereinafter be cited to "Outline" and the relevant paragraph number.

mand the bank would pay Baker any deficiency between the net proceeds actually received by Baker in connection with the sale of his shares and $16,303,869. Outline ¶ 1. The amount of $16,303,869 was arrived at by multiplying Baker's 1,207,694 shares by a price of $13.50 per share, the closing price on Health–Chem stock on the last trading day before the Outline was executed. The letter of credit was never delivered.

On July 7, 1987, Health–Chem, Speiser, and Baker entered into a "Settlement Agreement" which detailed and finalized the matters the parties had agreed to in the Outline.[2] *See* Settlement Agreement, Baker Affid. in Support of Summary Judgment Exh. A.[3] Health–Chem again agreed to pay Baker the difference between the aggregate sales price of his stock and $16,303,869. Settlement Agreement ¶ 1.4(a). The Settlement Agreement further provides for substitution of an escrow of government securities for the letter of credit provided for in the Outline. Settlement Agreement § 1.4(d). An escrow agreement between Health–Chem, Baker, and the Bank of New York, as escrowee,[4] was executed simultaneously with the Settlement Agreement. Pursuant to the escrow agreement, Health–Chem deposited securities with an aggregate market value of not less than $16 million into an escrow fund with the Bank of New York. *See* Escrow Agreement, annexed to Settlement Agreement, Exh. B.

Health–Chem has not arranged a sale of nor purchased any of Baker's Health–Chem shares. Following the October 19, 1987 stock market crash, Health–Chem stock fell to the range of approximately $4 per share and never returned to its former level. At that price, the deficiency that Health–Chem would have to pay Baker between the aggregate sales price and the guaranteed amount exceeds $11 million.

By this action Health–Chem essentially seeks: (a) a declaratory judgment that Baker is obligated to renegotiate the terms of the Settlement Agreement; (b) to enjoin Baker from forcing Health–Chem to sell to the public or repurchase Baker's shares; and (c) to enjoin Baker from requiring Health–Chem to pay Baker the monies due under the Settlement Agreement.

## DISCUSSION

Health–Chem's arguments against enforcement of the Settlement Agreement center on the terms of a restrictive covenant included in an Indenture executed by Health–Chem in April 1981. Pursuant to that Indenture, Health–Chem authorized and issued $20,000,000 in principal amount of Health–Chem debentures. *See* Indenture, Baker Affidavit in Support of Motion for Summary Judgment, Exh. C. Section 7.06 of the Indenture throws Health–Chem into default on the debentures if it were to "make any distribution on its Capital Stock or to its stockholders ... or purchase, redeem or otherwise acquire or retire for value any Capital Stock" in excess of the "Available Amount." The Available Amount is defined in § 7.06(b) of the Indenture as fifty percent of Health–Chem's net earnings since 1980 plus any amount Health–Chem has received from the sale of its shares since 1980.

### A. *The Effect of the Indenture's Restrictive Covenant*

Health–Chem contends that if it sells Baker's shares to a third party for less than $13.50 per share, the deficiency it must pay to Baker in return for his stock constitutes an indirect "distribution" under

---

**2.** The Settlement Agreement states that it is governed by Delaware law. § 10.5.

**3.** References to the Settlement Agreement will hereinafter be cited to "Settlement Agreement" and paragraph numbers.

**4.** By stipulation among the parties dated December 23, 1988, all claims involving the Bank of New York were dismissed without prejudice,

except for the Bank of New York's second cross-claim against Health–Chem in its September 28, 1988 answer and counterclaim, which was dismissed with prejudice as to claims for the period prior to December 23, 1988, and without prejudice with respect to any claims for the period after December 23, 1988, and which are pursuant to the Escrow Agreement and the stipulation.

§ 7.06. As such, the argument continues, the restrictive covenant in the Indenture bars Health–Chem from making the deficiency payment to Baker in excess of the Available Amount. As of June 30, 1988, the Available Amount totalled $3,474,206. Baker's 3(g) Statement ¶ 26. A "distribution" of more than the Available Amount would effect a default under § 7.06 of the Indenture, thereby resulting in an acceleration of payment of the $20 million principal outstanding debt.

Health–Chem's interpretation of "distribution" relies on the admission of extrinsic evidence in order to determine the meaning to be given § 7.06. Admission of such evidence, however, is not warranted by the unambiguous provision of the Indenture nor supported by the law. Contract terms must be construed so as to give effect to the intent of the parties as indicated by the language of the contract. *Curry Road Ltd. v. K Mart Corp.*, 893 F.2d 509, 511 (2d Cir.1990). Extrinsic evidence of the contracting parties' intent is admissible only when the language of the contract is ambiguous. *Id.* Whether a contract term is ambiguous is a question of law. *Id. Walk–In Medical Centers, Inc. v. Breuer Capital Corp.*, 818 F.2d 260, 263 (2d Cir.1987). Contract language is not ambiguous when it has " 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.' " *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989) (quoting *Breed v. Insurance Co. of North America*, 46 N.Y.2d 351, 355, 385 N.E.2d 1280, 1282, 413 N.Y.S.2d 352, 355 (1978)). Conversely, a term is ambiguous when it is " 'capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Walk–In Medical*, 818 F.2d at 263 (quoting *Eskimo Pie Corp. v. Whitelawn Dairies, Inc.*, 284 F.Supp. 987, 994 (S.D.N.Y.1968)).

That the parties disagree as to the definition of the term "distribution" in § 7.06 does not in itself create a question of fact. *See Wards Co. Inc. v. Stamford Ridgeway Assocs.*, 761 F.2d 117, 120 (2d Cir.1985) ("words do not become ambiguous simply because lawyers or laymen contend for different meaning"). Health Chem's broad, not to say tortured, reading of "distribution" cannot, in any practical sense, be supported. Section 7.06 provides no more than that Health–Chem may not "make any distribution on its Capital Stock or to its stockholders ... or purchase, redeem or otherwise acquire or retire for value any Capital Stock" in excess of the "Available Amount." Under the Settlement Agreement Health–Chem did not obligate itself to redeem any shares, either directly or indirectly; Baker's shares could be sold to third parties, and need not be returned to the company. As such, the payment of the deficiency to Baker would not result in any of the consequences of a "distribution" on stock as that term is commonly understood in a business context. A distribution with respect to Baker's shares would be payable to the owners of the shares, namely, the purchasers, and not Baker. A distribution would also result in the reduction of shareholders' equity and affect capital or surplus accounts. Yet Health–Chem's own consolidated statement of earnings for 1987 contains a provision for loss on the Settlement Agreement of over $10 million, which is treated as a deduction in computing loss from continuing operations.

Health–Chem's basic premise—that a deficiency payment to Baker is a "distribution" with respect to Baker's shares within § 7.06—is thus not supported by any common-sense interpretation of the terms of the Indenture. Viewed objectively and in context, the broad scope that Health–Chem seeks to graft onto "distribution" is at odds with both the plain meaning of § 7.06 and its clear intent to preserve the cushion against losses by creditors provided by the shareholders' equity account through restrictions on transactions that would reduce capital and surplus accounts. *See*

*Hunt Ltd.*, 889 F.2d at 1277 (court need not find ambiguity where interpretation urged by one party would strain the contract language beyond its reasonable and ordinary meaning). Recognizing that interpretation of a clear contract is a matter of law for the court to decide, *American Home Products Corp. v. Liberty Mutual Insur. Co.*, 748 F.2d 760 (2d Cir.1984), I find that Health–Chem's agreement to pay Baker the deficiency payment is not the equivalent of Health–Chem purchasing its own shares or making a distribution with respect to its shares.[5] Significantly, the Indenture does not contain a provision limiting the debt that Health–Chem may incur. Nor can § 7.06 be read to encompass such a restriction. It does not restrict guarantees, and I will not add by implication what the Indenture does not provide for explicitly.

### B. *Renegotiation under the Settlement Agreement*

Health–Chem next argues that the Settlement Agreement itself must be read to bar payment to Baker because the Settlement Agreement conflicts with the Indenture. This argument is founded on an "invalidity clause" in the Settlement Agreement that requires the parties to "negotiate in good faith to modify" the Settlement Agreement if any of its terms "in invalid, illegal or incapable of being enforced by a rule of law or public policy." Settlement Agreement, § 10.10. Health–Chem contends that § 1.4(a) of the Settlement Agreement, which provides that Health–Chem will pay Baker at least $13.50 per share for his shares, will induce breach of § 7.06 of the Indenture and is therefore invalid, illegal, or legally unenforceable and should be renegotiated.[6]

#### 1. No breach of the Indenture

As a threshold matter, I do not find that performance by Health–Chem of its obligations under the Settlement Agreement would breach the Indenture. Expenditure by Health–Chem of more than the Available Amount, if that amount was not spent for the purchase of or distribution with respect to Baker's stock, does not constitute a breach. As I concluded above, payment to Baker of the difference between $13.50 per share and what the shares are actually sold for is not the equivalent of a distribution under the Indenture.

Moreover, the Settlement Agreement provides for several alternative methods of selling Baker's stock that would not fall afoul of the Indenture's restrictive covenant. Specifically, the Settlement Agreement gives Health–Chem the option to arrange for the sale of Baker's shares in at least five different ways, only one of which—buying the shares itself—could result in a default under the Indenture. Section 1.3 of the Settlement Agreement provides that Health–Chem has the "sole and exclusive right" to direct the manner and timing of the sale of Baker's shares, "in any manner which Health–Chem in its sole discretion, chooses" including:

(1) in an underwritten public offering,

(2) through stockbrokers in market transactions,

(3) in negotiated private transactions,

---

**5.** Health–Chem also argues that Baker made it known that he did not want his shares sold until after January 1, 1988, so that he could change his domicile to Florida and avoid New York capital gains tax on the sale. Robert Speiser Affid. in Opposition to Baker's Summary Judgment Motion at 47–49. Baker asserts that this matter was discussed, but that Health–Chem would agree only to defer the sale until August 1, 1987, the date set forth in the Settlement Agreement. Baker Reply Affid. in Support ¶ 8. Because the Settlement Agreement expressly provides for the August 1 date, parol evidence is inadmissible to alter it.

**6.** Baker states that he has in fact attempted to renegotiate in good faith by making two proposals to Health–Chem. First, Baker proposed that Health–Chem immediately pay him the current Available Amount, and within one year pay him the deficiency, plus interest. Second, he proposed that Health–Chem offer his shares to the Health–Chem debenture-holders at the then market price of $4 per share in exchange for their debentures at par value, with Health–Chem to pay the deficiency of $9.50 per share. Health–Chem rejected both proposals. Health–Chem proposed that it would sell the shares at a maximum of $4.97 per share, totalling approximately $6 million, pay Baker the current Available Amount, and then pay him interest on the balance until such time as the funds were available under the Indenture. Baker refused.

(4) buying the shares itself, and

(5) by a combination of the foregoing. Performance of its obligation under the Settlement Agreement would thus not necessitate Health–Chem breaching its contract with the holders of its debentures.

## 2. Reorganization of Health–Med

Health–Chem also claims that its "inability" to reorganize Health–Med, its partly-owned subsidiary, as contemplated by the Settlement Agreement requires renegotiation of the Settlement Agreement under § 10.10. Health–Med's sole assets are Health–Chem stock, and its only shareholders are Health–Chem, Baker, and Speiser. Health–Chem claims that the reorganization of Health–Med was a ·critical element of the settlement, primarily because of Baker's fifty-percent ownership of Health–Med common stock. Health–Chem asserts that the Health–Med reorganization is stymied because the full value of Health–Chem stock held by Health–Med is now less than the $40 million liquidation preference attached to Health–Med's junior preferred convertible stock.

■ The reorganization of Health–Med, however, was not a condition of Health–Chem's obligations under the Settlement Agreement. Indeed, the Settlement Agreement specifically provides for Baker to exchange his 20,000 shares of Health–Med common stock for 151,376 shares of Health–Chem common if there is no reorganization. Settlement Agreement § 3.2. Because Health–Chem will not receive as much benefit from the Health–Med reorganization following the drop in price of Health–Chem stock does not render the Settlement Agreement invalid, illegal, or unenforceable. It simply makes performance under the Settlement Agreement more expensive.

Section 10.10 of the Settlement Agreement is thus inapposite to the circumstances here, which involve not a question of illegality of invalidity, but of enforcement of a contract that has become economically unadvantageous for one party to fulfill. The Settlement Agreement is a private agreement to which no "public interest"

inures. Baker protected himself against a drop in the price of his stock by obtaining a guarantee from Health–Chem that he would receive at least the current market price for his shares. Health–Chem assumed the risk of price fluctuation by not setting a cap on its liability. The provision guaranteeing Baker $13.50 per share for his shares is thus neither invalid, illegal, nor incapable of being enforced under any definition, legal or otherwise, of those terms.

### C. *Alleged Oral Agreement to Limit Liability*

■ Health–Chem further calls for renegotiation on the basis of an alleged oral understanding with Baker that Health–Chem's liability under the Settlement Agreement would not exceed the Available Amount. Health–Chem claims that payment to Baker under *any* of the alternatives in the Settlement Agreement would result in a deficiency payment that exceeds the current Available Amount, thus violating the alleged oral understanding and mandating renegotiation. That oral understanding, however, was not expressed in either the Outline of Settlement or the Settlement Agreement. Nor is it supported by implicit or explicit evidence· in the record before me. Indeed, such a limitation of liability, considering that there is no companion provision limiting Health–Chem's reduction of the Available Amount to a minimum level, renders Health–Chem's guarantee of $13.50 per share illusory. And it is contrary to common sense that a limitation on liability of that nature would not have been expressly ·set forth in the Settlement Agreement, especially considering that millions of dollars were at stake and that the Settlement Agreement was executed by sophisticated businessmen with adverse interests and represented by experienced corporate counsel.

Health–Chem's claim of an oral agreement limiting its liability to the Available Amount is also belied by the fact that Health–Chem deposited collateral of $20 million, worth more than twice the $8 million constituting the Available Amount

when the Settlement Agreement was executed, to secure its obligation to Baker. Health–Chem's argument that the $20 million was expected to cover only the contingency that Health–Chem stock would be selling at $13.50 per share or more, and Health–Chem might willfully refuse to sell, is frivolous. In those circumstances Baker could simply sell his stock and sue Health–Chem for the difference. The only rational explanation is that Health–Chem apparently recognized that its liability might exceed the Available Amount, for it is only in those circumstances that Baker would not be able to mitigate damages and the $20 million would be needed. From these circumstances I cannot but conclude that the alleged oral agreement did not exist.

### D. Baker's Fiduciary Duty

■ Health–Chem next argues that Baker should be estopped from enforcing the Settlement Agreement because he had a fiduciary duty to Health–Chem to insist on a provision in the Settlement Agreement that limited Health–Chem's liability to the Available Amount. Notwithstanding its apparent lack of standing to assert such a claim, Health–Chem has not alleged that Baker took advantage of any inside information he had obtained as a director, that he failed to disclose any facts he knew that other directors were unaware of, or that he had any other advantage as a result of having been a director. Nor does Health–Chem claim that Baker caused, intended, or anticipated the decline in the price of Health–Chem stock. Baker was no longer a director when the Settlement Agreement was signed, and it is clear that the other directors not only were aware of his adverse interest, as evidenced by the prior lawsuits, but also were hostile to his interests as well.[7] Nevertheless, the other directors unanimously ratified the Settlement Agreement.[8]

Health–Chem has made no showing that Baker took unfavorable advantage of his position. And considering that Health–Chem apparently remained free to reduce the Available Amount unilaterally by either paying dividends or buying its own stock,[9] Health–Chem's argument that Baker had a fiduciary obligation as a director not to permit Health–Chem to take the risk that Health–Chem shares would fall so far, is disingenuous.

### E. Health–Chem's Motion to Amend the Complaint

Finally, Health–Chem seeks to amend its complaint to add, in essence, three further arguments to excuse its non-payment to Baker. It contends that the Settlement Agreement should be reformed on the basis of commercial impracticability, frustration of purpose, and mutual mistake because performance would inevitably violate the Indenture. For example, Health–Chem argues that it is impractical to refinance the debentures at this time or to have a successful public offering of Health–Chem stock. However, a change in market conditions or an increase in the cost of performance are insufficient grounds to assert these defenses. Quite a bit more is required than demonstrating a desire to avoid the consequences of a deal gone sour. Health–Chem did not undertake to sell Baker's shares for a minimum of $13.50 per shares only if the sale proved practical or economically advantageous. As such, Health–Chem's motion to amend the complaint is denied as futile.

7. Health–Chem stated in its complaint that it entered into the Settlement Agreement to rid the company of Baker's "disruptive influence." ¶ 7.

8. Unanimous ratification by disinterested directors of a corporation's contract with one of its directors, where that director's adverse interest is disclosed, removes the presumption of invalidity of corporate transactions with a director under both New York and Delaware corporation law. See N.Y.Bus.Corp.Law § 713(a) and Del.Corp.Law 8 Del.C. § 144.

9. As of December 31, 1987, Health–Chem had purchased 449,100 shares of its own stock for $3,078,000, thereby reducing the Available Amount by that amount. Health–Chem's 1987 Annual Report, Baker Reply Affidavit in Support of Baker's Motion for Summary Judgment Against Health–Chem, Exh. G, Footnote 10(c). Health–Chem also provided Baker with a statement showing that it purchased 114,000 additional shares in 1988 for $521,798. Id., Exh. H.

Health–Chem also argues that summary judgment is inappropriate because additional discovery is required. Health–Chem, however, has not complied with the requirements of Fed.R.Civ.P. 56(f). It has failed to submit an affidavit showing the nature of the uncompleted discovery, how that discovery could reasonably be expected to create a genuine issue of material fact, and what efforts have been made to obtain those facts earlier. Moreover, considering that this case has been pending for eighteen months, and that the request to consider parol evidence to alter the Settlement Agreement has been denied, no further discovery is necessary. *See, e.g., Samuels v. Eleonora Beheer, B.V.,* 500 F.Supp. 1357, 1362 (S.D.N.Y.1980) (Weinfeld, J.) (the discovery rules "are not a hunting license to conjure up a claim that does not exist."), *aff'd,* 661 F.2d 907 (2d Cir.1981). Baker's motion for summary judgment is therefore granted and the complaint is dismissed.

## F. *Speiser Summary Judgment Motion*

Speiser moves for summary judgment dismissing Baker's fourth counterclaim as against him in his individual capacity. Baker contends that Speiser signed the Outline of Settlement without limiting the effect of his signature in any way and therefore is personally liable for Health–Chem's performance as well as his own. This argument presumes that the Settlement Agreement is an "executory accord", whereby if a default in making the specified payment to Baker under the Settlement Agreement occurs, Baker is entitled to sue Speiser individually under the Outline of Settlement. It is thus only under the Outline of Settlement that Baker is moving for summary judgment against Speiser. Baker's Memorandum in Further Support of Baker's Motion for Summary Judgment against Speiser and Answering Memorandum in Opposition to Speiser's Cross–Motion for Summary Judgment at 1–2.

Baker relies on the legal presumption that the Settlement Agreement is an executory accord because, he argues, it provides for the discharge of an existing claim, namely, default on the letter of credit under the Outline, by a future performance. But to the extent Baker seeks to hold Speiser liable under the Outline, his claims are barred by the parol evidence rule. Baker is precluded from asserting a claim under a prior agreement, the Outline of Settlement, because that document has been superseded by an integrated contract, the Settlement Agreement. First, the Outline of Settlement specifically provides that it "will be incorporated into a definitive agreement to be negotiated and executed among the parties as soon as possible." Outline ¶ 1. Second, the Settlement Agreement contains a "merger" or "integration" provision which provides: "This Agreement embodies the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral or written, in respect thereof. This Agreement may be changed only by an agreement in writing signed by the party against whom any waiver, change, amendment, modification or discharge may be sought." § 10.1.

Moreover, even if the terms of the Outline were enforceable, the Outline itself makes clear that Speiser did not sign as an individual. Each of the Outline's paragraphs distinguishes the three parties and separates the rights and obligations among them. Speiser did not obligate himself to pay the deficiency; his only obligation under the Outline was to exchange general releases with Baker, to dismiss various lawsuits, and to participate in the contemplated reorganization of Health–Med. Outline of Settlement, ¶¶ 2, 8, 9.

Similarly, the Settlement Agreement, by its very terms, provides that Speiser is not legally obligated to perform Health–Chem's obligations. Section § 10.11 of the Settlement Agreement states: "The signature of any party to this Agreement shall represent his or its obligation to be bound by the covenants and agreements on his or its part to be performed hereunder and not of the obligation of any other party." Baker has conceded that § 10.11 "releases"

Speiser of any personal liability for Health–Chem's alleged breach of the Settlement Agreement.[10] Baker's Memorandum in Support of Motion for Summary Judgment at 53–54. Speiser's motion to dismiss Baker's fourth counterclaim as against him in his individual capacity is therefore granted.

In sum, Health–Chem's motion to amend its complaint is denied and Baker's motion to dismiss the complaint is granted. Baker is granted summary judgment on his counterclaims except for the fourth counterclaim, against Speiser individually, which is dismissed. Baker is to submit judgment on five (5) days notice ten (10) days from the date hereof.

SO ORDERED.

---

10. Almost every provision of the Settlement Agreement, including § 1.4 on which Baker bases his right to payment by Health–Chem refer to covenants of Health–Chem or Baker, not Speiser. Under the Settlement Agreement the only obligations Speiser undertook are contained in § 3.1 (the contemplated reorganization of Health–Med), § 6 (dismissal of prior lawsuits) and § 7.2 (releases).