Shirley **WILDER**, et al., **Plaintiffs,**

v.

Blanche **BERNSTEIN**, et al., **Defendants.**

No. 78 Civ. 957 (RJW).

United States District Court,
S.D. New York.

Feb. 23, 1994.

American Civil Liberties Union Foundation, Children's Rights Project, New York City (Marcia Robinson Lowry, Anne W. Murdaugh, of counsel), for plaintiffs.

Law Dept. of the City of New York, Office of the Corp. Counsel, New York City, Paul A. Crotty, Corp. Counsel (Joel Berger, Randie Liss, of counsel), for defendants.

Donald J. Cohn, Polier, Tulin & Cohn, New York City (Alexandra C. Cohn, of counsel), for intervenors.

The Legal Aid Soc., Juvenile Rights Div., Sp. Litigation Unit, New York City (Kay G. McNally, Michael D. Scherz, Karen Freedman, Gayle Lerner, of counsel), for plaintiffs-intervenors.

ROBERT J. WARD, District Judge.

Plaintiffs have moved to hold defendants in contempt of the Stipulation of Settlement (the "*Wilder* Stipulation") issued as a final order by this Court on February 19, 1987. In argument over the merits of the pending contempt motion, a dispute arose over the

interpretation of the stipulation; namely, whether or not the stipulation applied to children in kinship foster care. For the reasons that follow, this Court finds that, as a matter of law, the provisions of the *Wilder* Stipulation unambiguously apply to children in kinship foster care.

## BACKGROUND

The contempt motion presently before the Court originated in June of 1973 as a lawsuit in which plaintiffs alleged comprehensive racial and religious discrimination in the administration of New York City's foster care system. Plaintiffs charged that various New York State statutes and constitutional articles violated the Establishment Clause of the First Amendment of the United States Constitution and thus were invalid on their face. The case proceeded to a hearing before a three-judge panel.[1]

In its opinion in *Wilder v. Sugarman*, 385 F.Supp. 1013 (S.D.N.Y.1974), the court held that the New York statutes were not facially invalid. However, the three-judge panel left open "other questions presented by the pleadings, including the issue of whether or not one or more of those New York constitutional or statutory sections [were unconstitutional] in their implementation." *Id.* at 1029.

Following that decision, the parties engaged in extensive discovery and motion practice. Eventually, the case was reassigned to this Court. In May of 1978, the New York Civil Liberties Union, co-counsel for plaintiffs in *Wilder v. Sugarman*, followed the suggestion of this Court and filed a new action, *Parker v. Bernstein*, 78 Civ. 957 (RJW). The new lawsuit raised similar challenges to the New York City child care system, but took account of intervening changes in the system. By order dated June 2, 1978, the Court dismissed the earlier-filed suit on stated conditions, among them, that the opinion of the three-judge court in *Sugarman* would be treated as *stare decisis* for purposes of the surviving action.

After plaintiffs twice amended their complaint, *Parker v. Bernstein* was renamed *Wilder v. Bernstein* and this Court granted plaintiffs' motion for class certification. The parties again engaged in extensive motion and discovery practice. Finally, after a fourth amended complaint was filed on April 27, 1983, the parties appeared ready to proceed to trial.

According to plaintiffs' proposed pretrial order, submitted to the Court in the spring of 1983, plaintiffs intended to argue at trial that: 1) the New York City foster care system operated in a racially discriminatory manner, 2) the same system also operated in a manner that discriminated on the basis of religion, 3) defendants' conduct under the statutes addressing New York's child care system amounted to the establishment of religion in violation of the First and Fourteenth Amendments, and 4) defendants' practices under the statutory scheme burdened the Free Exercise rights of Protestant children in violation of the First and Fourteenth Amendments.

Shortly before trial was scheduled to begin in August 1983, plaintiffs and defendant New York City (the "City") attempted to renew settlement negotiations that had proven futile in the past. An initial draft of a stipulation of settlement was presented to the Court for approval in April 1984. In an order filed June 15, 1984, the Court granted leave to nineteen voluntary child care agencies (the "Intervenors") to intervene in the action for the purpose of opposing the proposed settlement. Over the next year, the proposed stipulation underwent substantial revisions as the parties crafted the document taking into account the critiques of the intervenors and other child care professionals.

These negotiations eventually proved fruitful and culminated in the presentation of the final stipulation of settlement to the Court on December 19, 1985. After issuing an Opinion and Order dated October 8, 1986 setting four conditions for the Court's approval of the *Wilder* Stipulation, the Court entered a final order approving the settlement on February 19, 1987.

Under the consent decree, the City agreed to modify its foster care child placement

---

1. Specifically, the court examined New York Social Services Law § 373(1), (2), and (5), New York Constitution Article 6, § 32, Family Court Act § 116(a), New York Social Services Law § 153 and New York Constitution Article 7, § 8(2).

procedures in order to implement the *Wilder* Stipulation's provisions, including ¶ 48 which calls for 30 day evaluations of all foster children to determine their specific service needs and the specific type of program they require. On July 14, 1993, plaintiffs in *Wilder* moved to hold defendants in contempt of the court order approving the *Wilder* Stipulation citing, *inter alia*, the failure of the City to apply the *Wilder* Stipulation's provisions to children in kinship foster care.[2]

### DISCUSSION

Plaintiffs' principal argument in support of their position is that under the plain language of the *Wilder* Stipulation, all children in foster care are entitled to the benefits of its provisions. Since kinship children are children "whose placement in foster care is the responsibility of the New York City Commissioner of Social Services," plaintiffs argue, *Wilder* obviously applies to them. Furthermore, plaintiffs allege that it is clear from the circumstances surrounding the formulation of the consent decree that the defendants knew, or should have known, that the *Wilder* provisions would apply to kinship foster children. Additionally, plaintiffs assert that there is no logical reason to deprive kinship children of *Wilder* benefits and that the Child Welfare Administration's ("CWA") performance in the supervision of kinship children is seriously deficient, thus increasing the need for *Wilder* protections for these children.

■■■ In opposition to the contempt motion, defendants present a three-pronged attack on plaintiffs' claims.[3] First, they argue that, as a matter of law, the *Wilder* Stipulation cannot extend to kinship care because kinship placements are irrelevant to the stipulation's stated purpose of safeguarding

against racial and religious discrimination in foster care placement. Since kinship children do not compete with or displace non-kinship children in the quest for available non-related foster homes and it is not discriminatory to place children with their own families rather than non-kinship foster parents, defendants contend *Wilder* does not apply.

Secondly, defendants argue that kinship care, as it is known today, did not exist at the time the *Wilder* Stipulation was negotiated and finalized. Thus, defendants claim that the City did not intend to include kinship children under the terms of the *Wilder* Stipulation and that the Court may not now judicially expand the stipulation to cover a group that was non-existent at the time the consent decree was negotiated and signed by the parties. Finally, defendants claim that the Court should abstain from interfering with *Eugene F. v. Gross,* Index No. 1125/86 (Sup.Ct., N.Y.Co.), an on-going state court case litigating the issue of kinship care.

I.   *Standard For Interpreting A Consent Decree*

■■■ Essentially, consent decrees should be construed as contracts, although they are to be enforced as court orders. *See United States v. ITT Continental Baking Co.,* 420 U.S. 223, 238, 95 S.Ct. 926, 935, 43 L.Ed.2d 148 (1975); *Equal Employment Opportunity Commission v. Local 580,* 925 F.2d 588, 592 (2d Cir.1991); *Berger v. Heckler,* 771 F.2d 1556, 1567–68 (2d Cir.1985). As is the case in interpreting contracts, a court must look to the plain meaning of the language used in the agreement when interpreting a consent decree. Thus, if the language of the settlement agreement is unambiguous, its meaning must be discerned within the "four corners"

---

**2.** Argument on this issue has been extensive. In addition to three legal briefs arguing the merits of their claim, plaintiffs submitted voluminous exhibits. Intervenors have likewise submitted two briefs and several letters in support of plaintiffs' position. In response, defendants have provided the Court with two memorandums of law, as well as numerous affidavits, arguing that *Wilder* does not apply to kinship care. Finally, the Legal Aid Society sought and was granted intervention on this matter and furnished the Court with legal briefs arguing that *Wilder* should not apply to kinship children. On October 15, 1993, the Court heard oral argument on this issue and,

with the exception of Legal Aid, all parties participated.

**3.** As an initial matter, defendants argue that the issue of whether the *Wilder* Stipulation applies to children in kinship foster care cannot be decided in plaintiffs' favor without a hearing. However, the fact that parties disagree as to the meaning of contractual terms "does not in itself create a question of fact." *Health–Chem Corp. v. Baker,* 737 F.Supp. 770, 773 (S.D.N.Y.1990), aff'd, 915 F.2d 805 (2d Cir.1990). Since the Court finds the *Wilder* Stipulation to be unambiguous in its terms, no evidentiary hearing is necessary.

of that document. *United States v. Armour & Co.*, 402 U.S. 673, 682, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971); *Suarez v. Ward,* 896 F.2d 28, 30 (2d Cir.1990).

■ However, in interpreting a consent decree, a court may also consider certain aids to construction, such as "the circumstances surrounding the formation of the consent order." *United States v. ITT Continental Baking Co.*, 420 U.S. at 238, 95 S.Ct. at 935. That said, it is still "inappropriate [for a court] to search for the 'purpose' of a consent decree and construe it on that basis." *Id.* at 235, 95 S.Ct. at 934. The reason for this is readily apparent.

> [T]he decree itself cannot be said to have a purpose; rather the parties have purposes generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve. For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it.

*United States v. Armour & Co.*, 402 U.S. 673, 681–82, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971).

■ Applying these general principles to the document before it, this Court finds that the *Wilder* Stipulation unambiguously applies to all New York City children whose placement is the responsibility of the Commissioner of Social Services, including kinship foster care children.

## II. *Plain Wording of the Wilder Stipulation*

Although the parties take diametrically opposed positions on the issue of kinship care,

both rely primarily on ¶ 4 of the *Wilder* Stipulation to support their textual arguments. Under the heading "Purposes," ¶ 4 simply states:

> The purposes of this Stipulation are: to ensure that all New York City children whose placement in foster care* is the responsibility of the New York City Commissioner of Social Services receive services without discrimination on the basis of race or religion and have equal access to quality services and to ensure that appropriate recognition be given to a statutorily permissible wish for in-religion placement in a manner consistent with principles ensuring equal protection and non-discrimination as defined in applicable New York State and federal laws, regulations and the Constitution.

Paragraph 4 also has a footnote which defines the use of the term "foster care" in the *Wilder* Stipulation:

> The term "foster care" as used in this agreement means out-of-home placement in a foster boarding home, agency operated boarding home, group home, group residence or child care institution.

Plaintiffs and intervenors assert that the wording of ¶ 4 clearly demonstrates that the provisions of *Wilder* apply to children in kinship foster care. Specifically, they point to the phrase "all New York City children whose placement in foster care is the responsibility of the New York City Commissioner of Social Services...." Since children placed in foster care with relatives are in the legal custody of the New York City Commissioner of Social Services and since kinship foster homes are defined in applicable state statutes and regulations as foster boarding homes, plaintiffs allege that kinship children must be covered by the *Wilder* Stipulation.[4]

---

4. Plaintiffs cite a substantial number of statutes and regulations in support of their argument that kinship care children are statutorily defined as foster children. Plaintiffs' Memorandum of Law in Support of Motion For Contempt and Enforcement of Certain Provisions of the *Wilder* Stipulation, at 20–23. In addition, they point to the *Wilder* panel's July 1991 report entitled "Kinship Care Background Report and Addendum" which compared kinship and non-related foster care and found the following similarities:

> Kinship foster parents and non-related foster parents receive the same subsidy rates and medicaid eligibility.

> Both kinship foster parents and non-related foster parents are required to receive the same mandatory training.
> Both types of foster families must receive the same number of required home visits by workers associated with the agency supervising the case.
> Both types of foster families are entitled to the same access to services.
> Both types of foster families are required to have the same case management and are subject to the same state utilization review standards. N.Y.Social Services Law § 153(d); 18 N.Y.C.R.R. §§ 430.9–430.13.

In response, defendants argue that the significance of ¶ 4 is its location under the heading "Purposes." Essentially, defendants contend that, because the *Wilder* Stipulation explicitly states its purpose, it cannot apply to a class of children to whom that purpose is irrelevant. According to the City, since placement of children with their relatives is irrelevant to the goal of remedying discrimination, *Wilder* does not apply to kinship foster children. To buttress their interpretation, defendants direct the Court's attention to various provisions of the stipulation that are aimed at ensuring the placement of foster children in a non-discriminatory manner.[5]

Defendants also argue that since all the plaintiffs' complaints filed with the Court alleged discrimination, the stipulation is thus limited to remedying that discrimination. However, their reliance on these filings is misplaced in the context of interpreting a consent decree. As the Second Circuit has previously held:

> "Having entered into the consent decree rather than bringing the dispute to trial, [the City] cannot now evade an integral portion of that decree on the ground that it was not directly tied to a federal claim." Such a result would impugn the integrity of the court and allow the [City] to avoid [its] bargained-for obligations—while retaining the benefits of concessions [it] obtained on other issues during the negotiations.

*Kozlowski v. Coughlin*, 871 F.2d 241, 245 (2d Cir.1989) (quoting *Kozlowski v. Coughlin*, 711 F.Supp. 83 (S.D.N.Y.1988)).

Plaintiffs and intervenors do not deny that a central purpose of the *Wilder* Stipulation is to prevent racial and religious discrimination. However, they argue that the consent decree has dual purposes. In addition to remedying discrimination, they allege that the stipulation is designed to improve the quality of foster care for all children.[6] In support of their interpretation, plaintiffs and intervenors urge the Court to look at ¶¶ 2 and 69 of the stipulation.[7]

On their face, these paragraphs tend to support plaintiffs' more expansive interpretation of the decree's purposes. According to ¶ 2, the "Stipulation of Settlement [was] signed ... to improve the lives of children and families who are part of the foster care system." Under the heading "Quality," ¶ 69 of the stipulation reads, "[CWA] will continue its efforts to improve the quality of care available to all children."

Defendants contend that these two paragraphs are merely window dressing. In oral arguments, defense counsel referred to ¶ 69 as "a nice euphemism," agreed to by the parties in order to "demonstrate the goodwill of all concerned" but that "it is quite unenforceable." Despite the fact that there is no inherent inconsistency between these two alleged purposes, defendants argue that ¶¶ 2

All of plaintiffs' examples tend to show that kinship care is a form of foster boarding home care administered by the New York City Commissioner of Social Services, and hence, covered by the *Wilder* Stipulation.

5. Specifically, defendants cite ¶¶ 9(c), 13(a), 18, 19, 21, 23, 24, 28, 30, 44, 56, 57, 58, 59, 60, 61, and 70. Defendants also point to the Second Circuit's description of the *Wilder* Stipulation:

> The settlement proclaims its purposes to be the assurance of placement of children without racial or religious discrimination and "appropriate" recognition of preferences for religious matching in a manner consistent with federal and state constitutions, statutes, and regulations. These purposes are implemented by an elaborate plan for child placement....

*Wilder v. Bernstein*, 848 F.2d 1338, 1343 (2d Cir.1988).

6. Intervenors make a compelling argument that one of the decree's purposes is to protect the best interests of the children. In support of their

claim, intervenors point out that they successfully objected to the first proposed stipulation on the grounds that it only sought to cure discrimination and failed to take the best interests of all children in foster care into consideration. The intervenors were eventually awarded attorney's fees for prevailing on this issue.

In awarding those fees, this Court credited the intervenors with assuring "that the best interests of all children were taken into account." *Wilder v. Bernstein*, 725 F.Supp. 1324, 1329 (S.D.N.Y. 1989). The Court also noted that the *Wilder* litigation "at its core revolves around the best interests of the children in the City's child care system...." *Id.* at 1327.

7. Plaintiffs and Intervenors also cite ¶ 9(e), which states:

> The parties welcome and are prepared to consider on a non-binding basis any other recommendations the consultant(s) deems appropriate for improvement in any and all aspects of the foster care system....

and 69 should not be allowed to "trump" ¶¶ 4 and 5.[8]

Assuming arguendo, that the purposes of the consent decree are limited to ¶¶ 4 and 5, the Court would still hold that kinship foster children are included within the scope of the *Wilder* Stipulation. In asserting that the beneficiaries of relief under a consent decree must be somehow logically related to the decree's stated purposes, defendants make an intellectual leap with no basis in law. Consent decrees can properly contain relief that may benefit nonvictims of the harms alleged in the underlying lawsuit. "In addition to the law which forms the basis of the claim, the parties consent animates the legal force of a consent decree. Therefore, a federal court is not necessarily barred from entering a consent decree merely because the decree provides broader relief than the court could have awarded at trial." *Local Number 93, International Ass'n of Firefighters v. City of Cleveland,* 478 U.S. 501, 525, 106 S.Ct. 3063, 3077, 92 L.Ed.2d 405 (1986). *See also Kozlowski v. Coughlin,* 871 F.2d at 244 (court has power to enforce a consent decree containing broader relief than it could have awarded after trial); *Burka v. New York City Transit Auth.,* 129 F.R.D. 80 (S.D.N.Y.1990) (due process interest is not a prerequisite to inclusion in settlement of a due process claim).[9] Defendants admitted as much in oral argument when they acknowledged that the provisions of the *Wilder* Stipulation applied to children in non-kinship foster care who were not the victims of discrimination. Defense counsel referred to such relief as a "fortunate side benefit."[10] There is no reason why kinship foster children should not be entitled to the same side benefits.

Consequently, even if the purposes of the decree were limited to ¶¶ 4 and 5 of the document, *Wilder* would still apply to kinship children. The wording of the stipulation is simple and clear on this issue. Paragraph 4 unambiguously states that the stipulation applies to "*all* New York City children whose placement in foster care is the responsibility of the New York City Commissioner of Social Services...."[11] (emphasis added).

The word "all" should not need defining. Nevertheless, because there appears to be confusion over the meaning of ¶ 4, the Court will risk sounding pedantic and provide Webster's. "All" means "the whole amount or quantity of; as much as possible; every member or individual component of." When used with a plural noun, as it is in ¶ 4, "all" means that a statement is true of each individual considered a member of that group. *Webster's Third New International Dictionary* 54 (1981). Thus, the scope of the phrase "all New York City children whose placement in foster care is the responsibility of the New York City Commissioner of Social Services," includes kinship foster children.

When originally approving the *Wilder* Stipulation, this Court stated that its "terms apply generally to the range of child care facilities and programs funded by [CWA], including the City's own Direct Care program." *Wilder v. Bernstein,* 645 F.Supp.

---

**8.** The parties quarrel over the meaning of these disputed paragraphs provides a persuasive example of the Supreme Court's wisdom in counseling courts not to seek the purposes of a consent decree, even when the document itself purports to explicitly state those purposes. *See United States v. ITT Continental Baking Co.,* 420 U.S. 223, 238, 95 S.Ct. 926, 935, 43 L.Ed.2d 148 (1975); *United States v. Armour & Co.,* 402 U.S. 673, 681–82, 91 S.Ct. 1752, 1757–58, 29 L.Ed.2d 256 (1971).

**9.** Moreover, the Supreme Court has consistently held that interpretations of a decree that better serve the decree's purposes cannot override the plain language of the document. *United States v. Atlantic Refining Co.,* 360 U.S. 19, 23, 79 S.Ct. 944, 946, 3 L.Ed.2d 1054 (1959); *Hughes v. United States,* 342 U.S. 353, 357–58, 72 S.Ct. 306, 308, 96 L.Ed. 394 (1952).

**10.** In fact, the evaluations, themselves, can be considered relief that goes beyond remedying racial and religious discrimination. It is not necessary to determine the "specific service needs" or the "level of care" required by each child in order to ensure a first come, first served placement system.

**11.** In addition, ¶ 22 of the stipulation pronounces that the City "shall refer *all* children for placement in accordance with the terms of this Stipulation," and ¶ 25, which applies to foster boarding home care—the only type of kinship care that exists—provides that "*all* children shall be placed with foster boarding home families appropriate for their needs." (emphasis added)

1292, 1304 (S.D.N.Y.1986), aff'd, 848 F.2d 1338 (2d Cir.1988).[12] The Court believes now, as it did at the time the stipulation was approved, that the consent decree applies to all foster care programs in existence and any that might come into existence in the future.

While it is true that the stipulation makes no explicit reference to kinship care, and the term, itself, may not have been mentioned during the negotiations, the footnote that describes the foster care programs covered by *Wilder* is descriptive, not limiting, and is all-inclusive in nature. The stipulation covered everything. Since plaintiffs and intervenors achieved the broadest possible definition of foster care in negotiations, there was no reason for them to make a direct reference to placement with relatives. Rather, if the City had intended to restrict the universe of foster boarding homes covered by *Wilder*, it was incumbent upon the City to do so explicitly.

III. *City's Knowledge When Entering the Stipulation*

■ Both plaintiffs and defendants devoted much time in their briefs and oral presentations to argument over the parties' intentions and the extent of the City's knowledge at the time the *Wilder* Stipulation was negotiated and finalized. Given the Court's finding that the plain meaning of the stipulation is unambiguous, reliance on such extrinsic evidence is unnecessary and would be inappropriate. *Curry Road Ltd. v. K Mart Corp.*, 893 F.2d 509, 511 (2d Cir.1990).

> Where, as here, the meaning of an agreement among sophisticated parties is unambiguous on its face, the agreement does not become ambiguous simply because one of the parties later asserts that it intended a different interpretation.... Nor should the court read an ambiguity into an agreement merely because one of the parties becomes dissatisfied with its position under the plain terms of the agreement.

*New Bank of New England, N.A. v. Toronto–Dominion Bank,* 768 F.Supp. 1017, 1022 (S.D.N.Y.1991). Nonetheless, the Court believes that there is ample evidence to show that the City knew, or should have known, that *Wilder* would apply to kinship care.

Admittedly, at the time the stipulation was negotiated, kinship care did not exist as a formal foster care program on the scale that it exists today. However, it is equally clear that during the *Wilder* negotiations, there were some children living with relatives who were considered foster children under the City's direct care program. In addition, as early as 1974, certain relative caretakers sued in state court to be treated as foster parents and were victorious. *Taylor v. Dumpson,* 79 Misc.2d 379, 362 N.Y.S.2d 888 (1974), *rev'd on other grounds,* 37 N.Y.2d 765, 375 N.Y.S.2d 90, 337 N.E.2d 600 (1975); *see also Matter of Lucinda G.,* 122 Misc.2d 416, 471 N.Y.S.2d 736, 739 (Fam.Ct.Del.Cty. 1983) (judicial decisions have construed [foster parent and foster child] to contemplate placement of a child with relatives"); *In re Alicia Gravina,* 89 A.D.2d 534, 452 N.Y.S.2d 612 (1982) (granting relative caretakers foster parent status and benefits). The existence of these kinship foster homes, together with the administrative and legislative movement toward treating all kinship care homes exactly like other foster homes, should have put even a minimally prescient City on notice that kinship care would be included under *Wilder.*

More importantly, even if kinship care sprang full blown from the regulations promulgated in 1985, or even from the laws passed in 1989, the City would still be required to provide the protections of *Wilder* to kinship children today since they are currently included within the group defined as "New York City children whose placement in foster care is the responsibility of the New York City Commissioner of Social Services." That they do belong to this group seems to be the one undisputed fact in this case.[13]

---

**12.** One such Direct Care program administered at the time the *Wilder* Stipulation was negotiated and signed was the placement of children with · relatives.

**13.** John E. Stupp, Assistant Deputy Counsel for the Division of Legal Affairs of the New York State Department of Social Services, submitted an affidavit in support of defendants' position

that *Wilder* does not apply to kinship foster children. In it he defines and describes the typical placement of a kinship child.

Kinship foster care, he states, is a "situation in which a child is in the legal custody of the commissioner of a social services district, such as HRA, and is placed with a relative within the third degree who is "approved" as a relative foster parent in accordance with Department

The City has presented no rationale to explain why it should be able to exclude certain foster children from the protections of *Wilder* merely by creating a new program that was not in existence when the stipulation was finalized.[14] Nor could they. Such a result would violate the wording and spirit of the consent decree whose provisions were drafted with flexible terms designed to adapt to an ever changing system.

For instance, ¶ 48 of the stipulation, which is at the center of the controversy before the Court, was written to accommodate changes in the foster care system. Under ¶ 48, the City is required to conduct evaluations "prior to placement ... (or in the case of pre-evaluation placements, no longer than 30 days after actually being placed)." Other than this time requirement—which is tailored to accommodate the City's need to immediately place children with relatives prior to evaluation in emergency situations—the only additional criteria demanded by this provision is that the evaluations must be performed "in accordance with the applicable provisions of the New York State Social Ser-

vices Law relating to evaluations of children" and "in accordance with good social work practice." The flexibility of these general qualifications allows the City to adjust its compliance under the consent decree to conform with changes in both the methods of providing foster care and the statutes and provisions that are "applicable" to foster children.

### IV. *Wilder Is Not Hostile to Kinship Foster Care*

■ Defendants and the Legal Aid Society have voiced concern that the application of *Wilder*'s placement evaluation provision to kinship foster children will result in their removal from the homes of relatives in violation of the state law preference for kinship placements.[15] This concern, however, is premised upon an overly simplistic view of the mandates of the *Wilder* Stipulation and the effect its application will have.[16] The state law preference for kinship care, like the state statutory preference for placing siblings in the same foster home, can be accommodated under *Wilder* so that the goals of both the stipulation and the statutes can be achieved.[17]

regulations" ¶ 3. A typical placement occurs, "when the local child protective service of the social services district determines that foster care is necessary to protect the child" ¶ 4.

This language defining kinship foster children fits squarely within the terms of the *Wilder* Stipulation, which defines its beneficiaries in ¶ 4 of the consent decree.

There are, of course, as defendants and the Legal Aid Society argue, differences between kinship foster care and other foster care programs. However, these are differences of degree, not of kind. For all significant purposes—the transfer of legal custody to the Commissioner, the requirement for screening and approval or certification of the foster homes, the city's obligation to provide ongoing supervision and planning to children in such foster homes, the payment of foster care rates to such foster parents, and the city's claiming of federal reimbursement for foster care services—state law and CWA practice recognize that these children are in foster care.

**14.** Indeed, intervenors point out that they have created a number of new programs to serve the changing needs of children entering the City's foster care system—programs to deal with HIV positive children, therapeutic foster boarding homes and mother-infant programs—and have met no resistance from the City in applying the provisions of *Wilder*, despite the fact that these programs were created after the stipulation was signed.

**15.** New York Social Services Law § 384–a(1–a) provides that the City shall "determine whether the child may appropriately be placed with a suitable person related to the child ..." Family Court Act § 1017 requires the court to place a child with a suitable relative when the statutory criteria are satisfied.

**16.** Defendants presume in their brief that plaintiffs and intervenors are surreptitiously attempting to undermine the system of kinship care. Defendants' Supplemental Memorandum of Law and Affidavits in Opposition To Plaintiffs' Motion For Contempt and Enforcement with Respect to the Issue of Kinship Care 11–14. Both plaintiffs and intervenors dispute this characterization of their motives and the Court sees no reason why their goals in arguing that kinship care is included under *Wilder* should be questioned. At any rate, however questionable the defendants' concern might be, it is certainly irrelevant. Inasmuch as the City, itself, will be administering the *Wilder* provisions, it can certainly assure that the state law preference for kinship care is honored, regardless of plaintiffs' motivations.

**17.** In fact, defendants and the Legal Aid Society's incompatibility argument is belied by the terms of the stipulation, itself, which explicitly provides numerous exceptions to the "first come, first served" principle of *Wilder*. For instance, ¶ 5 accommodates parental preferences for place-

All foster placements in which children are placed in foster homes—whether with relatives or with unrelated foster parents—must be supervised by child care agencies. The care that is provided to a particular child is a combination of the day-to-day nurturing, guidance and supervision provided by the individual family, and the supervision, support, training and additional services—such as planning, psychological counseling, specialized education, and medical services—that must be provided by the supervising child care agencies. These agencies are not interchangeable. They vary in their ability to provide certain services. Currently, the vast majority of kinship children are supervised by CWA's Office of Direct Child Care Services (ODCCS), although private voluntary agencies do supervise some kinship care homes.

To illustrate how the mandates of *Wilder* can be applied in perfect conjunction with the state law preference for kinship placements, let us follow a hypothetical child who is placed with a relative in accordance with the Family Court Act (FCA). A *Wilder* evaluation of that child may reveal that he or she has special needs and requires numerous agency services in addition to the supervision that the kinship foster parent can provide. Contrary to the concerns of the City and Legal Aid, such an evaluation under *Wilder* would not require the removal of the child from his or her related foster parent. Rather, if ODCCS is not the best available provid-

er of the needed services, *Wilder* would require that supervision of that particular kinship foster family be transferred to a voluntary agency which can better meet the child's needs.

In certain cases, a *Wilder* evaluation may reveal that it would be inappropriate for a child to remain with its kinship foster parent and the child will have to placed with either an appropriate kinship foster parent or a non-related foster parent. However, such a removal would be perfectly consistent with the state law preference for "appropriate" kinship foster care placements.[18] Thus, there is no incompatibility between the goals of *Wilder* and the City's and Legal Aid's desire to match children with their relatives.

### V. *Undue Hardship on the City*

■ Underlying, and perhaps driving the City's arguments against applying *Wilder* to kinship children is the threat of enormous expense. There is no question that the City's burden under *Wilder* has increased considerably since the consent decree was signed and approved. The number of kinship children has increased rapidly as both the state and CWA have clarified the processes for approving such homes. So has the number of children in over-all foster care placement, as well as the categories of children with special needs. There are more children in kinship foster care now than

ment of a child in a family with a particular religious affiliation. Exceptions are also made for "compelling therapeutic reasons," including, but not limited to, emergencies and "extraordinary circumstances" in which religious placement is required. (¶ 21) In addition, the stipulation provides that an agency may take a child's race and religion into consideration in matching the child with a particular foster family, as long as they are not the only factors. (¶ 25)

Paragraph 61 of the consent decree acknowledges the existence of "certain religions which have adherents whose religious beliefs pervade and determine the entire mode of their lives, regulating it with detail through strictly enforced rules of the religion." Notwithstanding other provisions in the stipulation, ¶ 61 authorizes CWA to determine that certain child care agencies or programs are "specially designated" to care solely for children of these religious groups. If parents request placement of a child in such an agency or program, the request shall be hon-

ored as long as the placement is "diagnostically appropriate" for the child.

Finally, as if anticipating the Legal Aid Society's fears, ¶ 39 of the stipulation provides that when evaluating a child after an initial placement—which would be the case in most emergency kinship placements—CWA must take into account the child's need to avoid unnecessary movement. "When the child or the child's family has developed a significant relationship in the child's current placement, so that movement would reasonably, as a matter of good social work judgment, be harmful to the child, or otherwise would be harmful to the child based on articulable facts, the child need not be moved." Just as these factors can be considered in a *Wilder* evaluation and placement, so can the state law preference for kinship care.

18. F.C.A. § 1017.1(a) and S.S.L. § 384–a.1–a each require a consideration of the appropriateness of the placement with the relative.

534

there were in all forms of foster care in New York City in 1986.

However, these facts do not justify narrowing the *Wilder* class. Moreover, the fact that the City has had difficulty meeting its obligations under *Wilder* does not provide support for the City's attempt to narrow the scope of the *Wilder* Stipulation. In arguing that *Wilder* does not apply to kinship foster children, the City raises the spectre of a motion for modification of the consent decree pursuant to Rule 60(b), Fed.R.Civ.P., and ¶ 77 of the *Wilder* Stipulation. The City is free to do so, and might well be successful in making such a motion.[19] However, the fact that defendants may have grounds to move for modification has no bearing on this Court's interpretation of the consent decree's clear and unambiguous language. The Court will not grant a modification in the guise of construing a consent decree. *See Hughes v. United States*, 342 U.S. 353, 357–58, 72 S.Ct. 306, 308, 96 L.Ed. 394 (1952); *United States v. Atlantic Refining Co.*, 360 U.S. 19, 23–24, 79 S.Ct. 944, 946–947, 3 L.Ed.2d 1054 (1959).

## VI. *Abstention*

■ There is little merit in defendants' *Burford* abstention argument. In *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), the Supreme Court held that a federal district court correctly abstained from reviewing the ruling of a state administrative agency that was appealable in state court. The ruling at issue in the federal court rested primarily on an interpretation of state law and the state court was empowered to "give fully as great relief, including temporary restraining orders, as the federal courts." *Id.* at 327, 63 S.Ct. at 1104. Under these circumstances, the Supreme Court believed that issues of comity and federalism warranted the federal court's abstention so that the state court would have a chance to initially interpret its own complex regulatory scheme. This brief description of the facts of *Burford* should make it plainly evident that the case is inapposite to *Wilder*.

Contrary to the City's assertions, in finding that the *Wilder* Stipulation has always applied to all children in foster care, including kinship foster children, this Court is not interpreting any state statutes or regulations governing the kinship foster care system. Rather, it is interpreting and enforcing a consent decree approved by this Court prior to the enactment of these regulations. In effect, the defendants are asking the Court to abstain from performing a duty which no other court has the authority to exercise. While this Court would never usurp the state court's right to interpret its own laws, it also recognizes that the state court has no jurisdiction to interpret the *Wilder* Stipulation. Thus, there are no grounds for this Court to abstain from doing so. *See United States v. International Broth. of Teamsters*, 907 F.2d 277 (2d Cir.1990); *United States v. American Soc. of Composers*, 832 F.Supp. 82 (S.D.N.Y. 1993).

Unlike *Burford*, interpreting the consent decree does not create a "double system of review," and there is no danger of inevitable "[d]elay, misunderstandings of local law, and needless federal conflict with the state policy. . . ." *Id.* 319 U.S. at 327, 63 S.Ct. at 1104.[20] Nor does this Court's ruling prevent the state courts from "interpret[ing] and enforc[ing] the numerous and recently-enacted state statutes and regulations regarding the kinship care system."

Obviously, any state court interpretation of this legislation must be taken into account by the City when implementing the provisions of the stipulation. Regardless of the manner in which these statutes and regulations are interpreted, however, as long as kinship care continues to be part of the foster care system, it will be subject to the provisions of the consent decree voluntarily entered into by the City and plaintiffs.

## CONCLUSION

For the foregoing reasons, the Court finds that kinship foster children are covered by

---

**19.** The Court notes that, in the event the City does move to modify the *Wilder* Stipulation, the limited leave to intervene which has been granted to the Legal Aid Society will be extended to cover issues of kinship care in any modification motion.

**20.** Needless to say, the fact that the parties to the state law action have voluntarily chosen to include a null and void clause in their proposed partial consent decree, which is activated if this Court refuses to abstain, has no effect on the Court's jurisdiction.

the terms of the *Wilder* Stipulation. Defendants are directed to take all appropriate steps to ensure that the protections of the consent decree are extended to children in kinship foster care.

It is so ordered.

