OPINION OF THE COURT
Nanette Dembitz, J.
These consolidated petitions, filed by the Commissioner of Social Services of New York City under section 358-a of the Social Services Law, involve the effect of the child welfare and public assistance systems on relatives who have on their own volition, without government intervention, taken over the care of children under the age of 18 from their parents.[1] In accordance with the policy adopted several years ago by the Department of Social Services (hereinafter the Department), the petitions ask the court to approve its grant to such relatives of foster parent status, and their consequent receipt of public funds at the so-called *461 foster care rate, which is more than double the rate of public assistance an indigent parent receives for his children (under the Aid to Dependent Children program, herein ADC). The Department’s grant of foster parent status to the relative also results in payments to the private agencies with which the Department contracts for foster care services, of amounts varying between $12 and $24 a day per child.
In the cases at bar the children had been in the care of relatives, mostly grandparents, from 2 to 12 years before the relatives applied for foster care status and the instant petitions were filed, the timing depending on the fortuity of when the relative happened to hear of the availability of the foster care rate. The court concludes for the reasons stated below that grant of these petitions and all others like them is beyond its authority under section 358-a of the Social Services Law. Such petitions must therefore be dismissed (despite the fact that their approval by this court is necessary for Federal reimbursement of the State and city expenditures for foster care).
While the court has no jurisdiction to prohibit the Department’s continued implementation on its own of its policy, it may be noted that a candid submission of the problem to the Legislature seems appropriate. For, despite the network of State and Federal child welfare and public assistance laws, none, as will be shown below, authorize the Department’s practice; nor do section 358-a petitions in cases of the instant type disclose their true circumstances;[2] nor in common understanding would relatives who on their own initiative assume care of children, be deemed foster parents.[3]
*462 I. NO JUDICIAL AUTHORITY UNDER SECTION 358-A OF THE SOCIAL SERVICES LAW
Under section 358-a, a social services official can petition for Family Court approval of a voluntary placement agreement — that is, an agreement by a parent or some other guardian to a child’s placement in foster care under the auspices of the Department of Social Services. The agreement can be approved, together with transfer of the child’s “custody and guardianship” to the social services official, only upon specified judicial findings. Besides a finding that “the parent, parents, or guardian executed” the agreement because of an inability to provide for the child at home, the Judge must further “find and determine that the best interest and welfare, of the child would be promoted by removal of the child from such home, and that it would be contrary to the welfare of such child for him to continue in such home” (Social Services Law, § 358-a, subd [3]).
In the instant section 358-a cases there is no factual basis for the required findings that the child’s interest “would be promoted by removal” from the parent or guardian’s home, or that he would be harmed by continuance there, for the child has been moved years before to the home of the relative, who is now being designated by the social services official as the foster parent. Indeed, in cases where the parent has become unavailable during the child’s residence with the relative, the signator of the “voluntary placement agreement” providing for “removal” from the parent’s home to foster care, is the relative with whom the child has been living and who is to .be given foster care status as a result of the agreement and the section 358-a petition.
The commissioner argues that the term “removal” in section 358-a should not be construed literally but should instead be construed to mean a change in the child’s status from that of a relative to that of a foster child in the foster care system. However, the issue here is more than semantics, for section 358-a in its entirety demonstrates that it was intended to apply to removals from the parent or *463 custodian by a social services official. Thus, to protect the parent and child against possible overreaching by the official, section 358-a mandates a judicial finding that the agreement for placement was “knowingly and voluntarily” made (see § 358-a, subd [3]), and authorizes the appointment of a Law Guardian for the child (§ 358-a, subd [6]), while the Family Court Act mandates the appointment of an attorney for the parent or custodian (Family Ct Act, § 262, subd [a], par [iv]). Clearly, section 358-a of the Social Services Law was not intended for the ratification of past private arrangements between relatives.

Legislative History

The legislative history confirms the conclusion that the findings provision of section 358-a must be read literally.[4] The section was enacted in response to a Federal law (now US Code, tit 42, § 672, subd [e]) for Federal reimbursement of “amounts expended by any State as foster care maintenance payments * * * in the case of any child who was removed from his or her home pursuant to a voluntary placement agreement” provided there is “a judicial determination * * * that such placement is in the best interests of the child.”[5]
Letters to the Governor by section 358-a’s supporters, stress the need to implement the Federal statute by requiring “a court determination that removal from the child’s home is in his best interest” (letter of Mayor Lindsay); and that section 358-a would not only result in fiscal benefit but would protect “the parent-child relationship * * * by extending the scrutiny of the courts over attempted placements which may be unnecessary or not in the child’s best interest” (letter from major sponsor of the bill in the State Senate, Senator Pisani).[6]
*464 Thus, all aspects of the statutory history demonstrate that section 358-a was intended to relate only to removals from the home of a parent or guardian pursuant to his agreement with a social services official.
The commissioner argues that this court should depart from the language of section 358-a because of general declarations as to the value of family life in various State and Federal statutes. However, the cited statutes relate to payments of two types, which are both irrelevant here. On the one hand are laws authorizing payments to relatives of the same public assistance allowances for the care of children (ADC) that are made to indigent parents.[7] Grants of this type, which do not implicate section 358-a, undoubtedly are available to the relatives here involved and were in fact received by many of them prior to the Department’s grant of their applications for foster care status and funds.
The remainder of the commissioner’s citations pertains to foster care payments to relative caretakers as the result of a court order removing children from their parents or guardians on the basis of a finding of neglect or abuse.[8] Such a governmental intervention on the basis of judicially found necessity, differs significantly in public import from the instant private decisions of parents and relatives as to the care of children.
Accordingly, the commissioner’s argument from the body of public assistance law is unpersuasive.
II. POLICY ARGUMENTS AS TO SCOPE OF SECTION 358-A
While the commissioner’s policy arguments as to the desirable scope of section 358-a could better be addressed to the Legislature, they will be briefly reviewed here. Though the Department’s practice as to foster care status for relatives may in some instances serve a worthy purpose, taken as a whole it seems to the court of questionable social value.
*465 a. Higher rate for relatives than parents
The commissioner seeks to justify public payment to relatives of larger amounts to maintain children than would be paid to parents, on the ground that only parents have a legal obligation for child support; and he suggests that without the foster care rate the relative might decide to oust the child from his home. Such an ouster had not been threatened in any case before this Judge and it seems an unlikely occurrence. In a number of cases the relative had been receiving the ADC rate for the child before fortuitously learning of the availability of the foster care rate,[9] and there seemed no basis for finding that she would have ousted the child because of dissatisfaction with that arrangement.
When the relative (usually a grandmother) is receiving ADC for herself and her own children, the conversion of the related children (usually grandchildren) to foster status results somewhat bizarrely in her receipt of different rates of public support for different children in the household, all of whom the relative presumably is and should be treating equally from the standpoint of their welfare. It may be noted that this financial arrangement is peculiar to cases in which the Department converts an existing private child care arrangement into “foster care”, because the regulations of the State Department of Social Services provide that families recruited and screened for the role of foster parents, must be self-supporting. (18 NYCRR 445.5 [former] [h].)[10]
A suggestion that relatives should through payment of the highest possible rate — the foster care rate — in effect receive compensation for their voluntary attentions to a *466 kinship child, contradicts the idea of family affection, closeness and moral responsibility, which are the very qualities making a relative’s home desirable for a child. Thus, the financial results of converting caretaking relatives into foster parents seem undesirable from the standpoint of philosophy as well as practical consequences.[11]
b. Foster Care Status for Purpose of Services to Child
The commissioner argues that foster care status is important for children in the care of relatives so that they will receive the services of a foster care agency. In fact, however, it is clear that the relative’s motive for applying for foster care status, as well as the Department representative’s reason for indorsing it, is primarily or entirely financial. Thus, for example, in the foster care recommendation produced in the instant cases, the Department representative gave no justification for it except that the grandmother could thereby obtain twice as large a grant as public assistance — ADC; and another Department worker testified that the reason for the indorsement for foster care status was the relative’s difficulty in supplying the birth certificate required to secure ADC. Indeed, the commissioner’s argument seems illogical. For, if the caretaking relative requests or appears to need counseling or other services, the Department worker could refer her to appropriate agencies as easily as recommend foster care certification.
In practice, other than the once-every-three-month visit by an agency worker mandated for every foster home under agency supervision, it is questionable whether substantial services are rendered in most of the relative foster parent cases. In a few in which the foster care worker testified as to his discovery of a need for services, the relative foster parent rejected the worker’s help — a problem in kinship foster homes that was foreseen by the *467 Department when the conversion system was inaugurated.[12] Thus, in the case of a 12-year-old eneuretic girl the grandmother rejected a recommendation of psychotherapy because of her disbelief in such outside assistance; and another grandmother, saying she wanted to conceal the child’s foster care status, refused to let the foster care worker contact the child’s school despite his school maladjustment. And, contrary to the commissioner’s argument that the relative may be induced by fear of termination of the foster care rate to accept appropriate services, there was no indication that such a termination was even considered in kinship foster care cases.[13]
c. Calibre of Kinship Foster homes
The certification of caretaking relatives as foster parents may well result in certification of substandard foster homes, in part because of the special procedure for certification in such cases. The method of certification is as follows: When the Department of Social Services receives a relative’s request for foster care status for a child in her care, a Department worker assigns the relative’s home to a private foster care agency (from which the Department purchases services), for a “special home study” and for agency certification as a foster home. Such agency certifications are not subject to any review. The certifying foster care agency then receives payments from the Department to act as the supervising foster care agency for the home it has certified.
Thus, the agency does not appraise the caretaking relative’s home in comparison to other foster homes, but on the singular basis of a preliminary determination by the Department of Social Services that certification is appropri *468 ate.[14] Illustrating the diminished standard that can be applied in special home study certifications, a great grandmother’s home was certified for a child, who had been living with her since her birth five years before and was the fourth public assistance generation; the great grandmother had raised both the grandmother and the mother who were alcoholic and/or drug addicted; the grandmother, the mother, and the mother’s paramour had visited the great grandmother’s home frequently and disruptively during the child’s five years of residence there, and had — without interference by the great grandmother — taken the child away from the home from time to time.
The court recognizes that despite some drawbacks it may be in the child’s over-all interest to remain in a kinship home in which he has been settled for years. However,'the policy of designating it as a foster home may result in its receipt of an unwarranted stamp of approval and its use for other children as well.
d. Foster Care Status as Income Distribution Measure
Finally, even if payment of the foster care rate to care-taking relatives is appraised merely as a method of distributing public funds to needy individuals, the Department’s policy is questionable. While the relative frequently has been supported by public assistance (as pointed out above), relatives are certified as foster parents regardless of income; in one extreme case the foster father’s income was over $50,000 a year. Further, since it is entirely fortuitous whether a relative hears of the availability of the foster care rate, the selection of those who receive it rather than a lower public assistance rate rests on no rational criteria.
e. Payments to agencies
The Department of Social Services pays a foster care agency for its services at the rate of $12 to $24 a day for each child in one of the homes it certifies. However, it is *469 clear that many of the services mandated by law, regulation, and the city’s contracts with the agencies, are inappropriate for a home in which the child has resided for a period before its certification, as in the caretaking relative cases.
Thus, a primary agency function is to arrange for appropriate visitation between a foster child and his parents and other relatives. In the case of violent, psychotic, alcoholic, and unfit parents visitation frequently must, for the child’s safety and stability, be limited to visits at the agency under its supervision. However, agency efforts to control parental visitation in a kinship foster home or prevent the parent’s elopement with a child, often are futile. Again, a frequent agency function is to educate a foster parent to “work with” the parent to improve parenting skills so that the child can return to her — an agency practice which also may be unfeasible because of the emotional relationship between the relative foster parent and the natural parent.
A major service mandated for the foster care agencies is an effort to secure a child’s adoption instead of indefinitely prolonged foster care — a policy preference declared in section 384-b of the Social Services Law. However, in foster care review proceedings (see Social Services Law, § 392) it is frequently disclosed that agencies refrain from services in regard to adoption in cases where a relative caretaker has been given foster care status; both the relative foster parent and the child may reject adoption as inappropriate, confusing, and distressing in view of the “foster parent’s” relationship with the parent.[15]
Finally* it is clear that a number of other functions included in the Department’s regulations and its “Agreement for Purchase of Child Welfare Services” are inappropriate in cases where the child has resided with the relative before she was certified as part of the foster care system. Illustrative of such services are “recruitment” of suitable foster parents; orienting “applicants who have been accepted for a home study to * * * the problems and reactions of children upon separation”; and discussion of “reasons a person seeks to become a foster parent”, of “the *470 person’s psychological readiness to assume responsibility for [the] child” and like subjects. (See 18 NYCRR Parts 443, 444.)
In indicating that the Department of Social Services is paying for services it is not receiving when relative caretakers are certified as foster parents, the court does not intend any aspersion on the foster care agencies. For it is Department of Social Services’ policy to seek and encourage the agencies’ certification of the homes of caretaker relatives and to pay for agency supervision of these homes on the same basis as other foster homes.
In sum, serious policy questions are presented by the Department’s program of granting foster care status to relatives who had on their own initiative prior to such grant assumed the care of children.

.. For brevity the term relative will be used herein to mean a relative other than a parent.

. The date of the relative’s conversion to foster parent status is listed as the date the “child was removed from his home,” and the name of the supervising foster care agency is listed as the place he “is currently residing.”

. In common understanding foster care seems to mean that an “agency *** is obliged to conduct an investigation and to determine the qualification of foster parents before placement of a child” (Matter of Bennett v Jeffreys, 40 NY2d 543, 545; emphasis added). And draftsmen of recent studies deploring the number of children in prolonged foster care without adoption, apparently were unaware of the number that are in fact with relatives who have been given foster care status. (See Adoption Web: Impediments to Placing Foster Children in Permanent Homes, Report from Office of City Council *462 President of New York City, 1981; Myth & Reality: A New Look at Children Available for Adoption, Report by Citizen’s Committee for Children of New York Inc., 1981; Redirecting Foster Care, Report by Mayor’s Task Force on Foster Care Services, 1980.)

. There was no predecessor statute to section 358-a: prior to its enactment there was no control or review of the decisions of the Social Services Department to accept voluntary placements.

. The Federal reimbursement rate for foster care is 50%, the State and city each paying 25%. The same proportions apply to ADC (public assistance for children who are not in foster care).

. These letters are contained in the “jacket” of the bill that became section 358-a. *464 There is no indication therein of any contrary intent.

. For the commissioner’s citations in this category, see US Code, tit 42, § 606; Burns v Alcala, 420 US 575; Social Services Law, § 131, subd 3.

. The commissioner’s citations in this category are Miller v Youakim, 440 US 125; US Code, tit 42, § 608; Taylor v Dumpson, 79 Misc 2d 379.

. A self-supporting caretaking relative, regardless of income, as well as one on public assistance, is entitled to public assistance for the child. In such a home, according to the commissioner’s brief “the child (is) considered a separate household” for public assistance purposes.

. Thus, a basis for fixing the foster care rate at a higher figure than the ADC rate apparently is the need to enable self-supporting foster parents to maintain the child as an integrated family member on their standard of living without loss.
See memorandum dated May 12, 1972 from city Commissioner of Social Services noting that an exception to the above regulation would be required before conversion of ADC-supported relatives to foster status.

. If in fact the relative is of such inclinations that she is induced to care for a child by the foster care rate, that rate may influence her to withhold the child after the parent’s crisis is resolved and he wants the child’s return. In that event the Department’s practice would frustrate the pre-eminent public policy of protecting a fit parent’s custody of his child.

. The present State Commissioner of Social Services stated in a memorandum she issued as city Commissioner of Social Services, dated May 12,1972 that in kinship foster homes “the relationship between the foster parents and the own parents may be a relatively intimate one and antedates the contact with the agency; the foster parents may have functioned for many years on an independent basis, may regard the child as their own and may not always be immediately accepting of agency supervision.”

. While prevention of parental interference with the relative’s custody of the child has also been advanced as a justification for grant of foster care status, in fact custody and guardianship proceedings are more feasible for this purpose (and had been used for siblings of some of the children involved herein).

. No information could be obtained from either the State or the city Department of Social Services as to whether the Department of Social Services ever failed to refer a kinship foster care applicant for a home study or whether a foster care agency had ever failed to certify a home Department of Social Services referred to it. Such failures seem doubtful.

. Some agency workers testified to the broader view that the goal of adoption was deemed inapplicable to a kinship foster home and never suggested it for such a home.