Shirley WILDER, et al.,
Plaintiffs–Appellees,

Mystique F., et al., Plaintiffs–
Intervenors–Appellants,

v.

Blanche BERNSTEIN, individually and as
Administrator of the New York City Human
Resources Administration, et al.,
Defendants–Appellants,

Abbott House, et al., Defendants–
Intervenors–Appellees.

Nos. 959, 960, Dockets 94–7322, 94–7324.

United States Court of Appeals,
Second Circuit.

Argued Dec. 13, 1994.

Decided Feb. 23, 1995.

Joel Berger, New York City (Paul A. Crotty, Corp. Counsel of the City of New York,

Michael S. Adler, New York City, on the brief), for defendants-appellants.

Michael D. Scherz, New York City (Kay C. McNally, Henry S. Weintraub, Lenore Gittis, Legal Aid Soc., Juvenile Rights Div., New York City, Karen Freedman, Gayle Lerner, Lawyers for Children, New York City, on the brief), for plaintiffs-intervenors-appellants.

Marcia Robinson Lowry, New York City (Susan Lambiase Gregory, Children's Rights Project, American Civil Liberties Union, New York City, on the brief), for plaintiffs-appellees.

Donald J. Cohn, New York City (Alexandra C. Cohn, Polier, Tulin & Cohn, New York City, on the brief), for defendants-intervenors-appellees.

Before: NEWMAN, Chief Judge, OAKES and CARDAMONE, Circuit Judges.

JON O. NEWMAN, Chief Judge:

The contempt proceedings that precipitated this appeal mark the latest chapter in extended institutional reform litigation concerning New York City's foster care system.[1]

Appellants are the municipal defendants responsible for administering that system ("the City"), and three foster children placed by the City with relatives ("Plaintiffs–Intervenors"). They challenge an order of the District Court for the Southern District of New York (Robert J. Ward, Judge), 153 F.R.D. 524 (S.D.N.Y.1994), partially ruling on a contempt motion that plaintiffs-appellees ("Plaintiffs"), a class of Black Protestant foster children, filed against the City. Judge Ward found that the terms of the consent decree executed by Plaintiffs and the City in 1984 (the "*Wilder* Decree" or "Decree") unambiguously apply to foster children placed with relatives ("kinship foster children"). Appellants contend that this ruling was erroneous, and that it is appealable as either a final order under 28 U.S.C. § 1291 (1988) or a modification of an injunction under 28 U.S.C. § 1292(a)(1) (1988). Also parties to

the appeal are intervenors-appellees ("Intervenors"), nineteen private child care agencies.

We hold that the District Court's order is not "final" for purposes of 28 U.S.C. § 1291. In addition, we find that the order is a proper construction of the Decree and not a modification for purposes of 28 U.S.C. § 1292(a)(1), and that consequently, although we agree with Judge Ward's interpretation, the end result is dismissal for lack of jurisdiction rather than a decision on the merits. Nevertheless, our § 1292(a)(1) jurisdictional ruling necessarily has implications for the merits of the appeal as well.

## Background

### A. The City's Foster Care System and the *Wilder* Litigation

All children in New York City in need of foster care services are placed in the custody of the Commissioner of Social Services and are the responsibility of the City Child Welfare Administration ("CWA"), formerly known as Special Services for Children ("SSC"). N.Y.Soc.Serv.Law § 395 (McKinney 1992), *et seq.*

CWA has traditionally entered into contracts with private, nonprofit "voluntary" agencies that perform the foster care tasks of placing children into foster boarding homes or congregate care facilities, monitoring placements, and providing essential services specific to each child's needs. Many of these agencies are operated under sectarian auspices. In addition to contracting with voluntary agencies, CWA itself operates foster boarding homes and congregate care programs ("direct care programs").

In 1973, Plaintiffs instituted a lawsuit alleging, among other things, racial and religious discrimination in the City's foster care placement and referral practices. In particular, the complaint asserted that inferior services were being provided to the class of Black Protestant foster children, because the

---

1. The case has spanned more than two decades. *See Wilder v. Sugarman*, 385 F.Supp. 1013 (S.D.N.Y.1974); *Wilder v. Bernstein*, 499 F.Supp. 980 (S.D.N.Y.1980); *Wilder v. Bernstein*, 645 F.Supp. 1292 (S.D.N.Y.1986), *aff'd*, 848 F.2d 1338 (2d Cir.1988); *Wilder v. Bernstein*, 725 F.Supp. 1324 (S.D.N.Y.1989), *aff'd*, 965 F.2d 1196 (2d Cir.), *cert. denied*, ___ U.S. ___, 113 S.Ct. 410, 121 L.Ed.2d 335 (1992).

City would match Catholic and Jewish foster children, who were primarily White, with Jewish and Catholic voluntary child care agencies, which had better services and which also would accept only those children of the religion with which each agency was affiliated.

The City and the Plaintiffs eventually engaged in settlement negotiations that culminated in the *Wilder* Decree, which was signed in 1984, filed with the District Court on January 2, 1985, finally approved by the District Court in 1987, and affirmed by this Court in 1988. *Wilder v. Bernstein*, 645 F.Supp. 1292 (S.D.N.Y.1986), *aff'd*, 848 F.2d 1338 (2d Cir.1988). The Decree has been monitored by Judge Ward, who has actively presided over the case since 1977.

### B. The *Wilder* Decree

The Decree applies to "all New York City children whose placement in foster care is the responsibility of the New York City Commissioner of Social Services." Decree, ¶ 4. Children are to be placed on a first-come, first-served basis in the best available agency program (¶¶ 19–21), and a classification and ranking system is to be implemented to identify the quality of the various foster care programs (¶¶ 7–12). In addition, prior to placement in foster care, or no later than 30 days after placement, children are to receive evaluations of their needs. The evaluations must be conducted in accordance with state law and "good social work practice, to determine (1) the specific service needs of the child and (2) the level of care, and the specific type of program required by the child" (¶ 48). These foster care programs may be operated by either voluntary agencies or the City. Children are then placed in foster boarding home care or congregate care, under the supervision of a voluntary agency or the CWA direct care programs.

### C. Kinship Foster Care

Placement of children for foster care with relatives is known as a "kinship placement," and such children are referred to as "kinship children." At the time the *Wilder* Decree was negotiated, one of the City's direct care programs used kinship placements, but there were few, if any, kinship placements by the voluntary agencies. 153 F.R.D. at 531 n. 12. Today, over 40 percent of the foster child population in the custody of the Commissioner of Social Services are kinship children. *See* Task Force on Permanency Planning for Foster Children, Inc., *Kinship Foster Care: The Double Edged Dilemma* v (1990). Seventy percent of these kinship foster children are currently placed by CWA's direct care programs, with the remainder placed by voluntary agencies.

State regulations that went into effect in 1985, before the *Wilder* Decree was approved, treat kinship foster care placements similarly to non-kinship foster boarding home placements, *compare* N.Y.Comp.Codes R. & Regs., tit. 18, § 443 (1985) *with* N.Y.Comp. Codes R. & Regs., tit. 18, § 444 (1985), though there are some dissimilarities relating to the licensing process for foster homes, *compare* N.Y.Comp.Codes R. & Regs., tit. 18, § 444.5 (1991) *with* N.Y.Comp.Codes R. & Regs., tit. 18, §§ 444.8 (1991). In 1989, New York State enacted legislation requiring local social service districts to search for suitable and willing relatives with whom a child in need of placement may appropriately reside, and further requiring, if such a relative is found, that the child be placed with that relative. N.Y.Soc.Serv.Law § 384–a(1–a) (McKinney 1992); N.Y.Fam.Ct. Act § 1017 (McKinney 1983 & Supp.1993).

### D. The Contempt Proceedings and the Appeal

On July 14, 1993, Plaintiffs filed a contempt motion against the City, alleging that the City had failed to comply with numerous provisions of the *Wilder* Decree. As a defense to Plaintiffs' claim that the City was required to evaluate and place kinship foster children in accordance with the terms of the Decree, the City contended that the Decree does not apply to kinship foster care but covers only placements in non-relative foster homes or with agencies.

In reaching his conclusion as to the scope of the *Wilder* Decree, Judge Ward observed that the Decree expressly applies to "*all* New York City children" in foster care (Decree, ¶ 4) (emphasis added), and that foster chil-

dren placed with relatives were therefore covered, notwithstanding the fact that kinship foster care was not specifically mentioned by the parties either during settlement negotiations or in the Decree. 153 F.R.D. at 530–31.

Although Judge Ward found it unnecessary to look further than the language of the Decree, which was in his view unambiguous, he also noted that the City was certifying kinship homes as approved foster homes at the time of the 1984 settlement negotiations and was aware of the State's plan to promulgate specific regulations governing kinship foster care. *Id.* at 531. Therefore, if the City intended to *exclude* kinship foster care, it could and should have done so explicitly. Judge Ward further noted that even if kinship foster care did not exist in 1984, "the consent decree applies to all foster programs in existence and any that might come into existence in the future." *Id.* In addition, he observed that the Decree is compatible with kinship foster care and state regulations requiring kinship placements. *Id.* at 532–33. Finally, Judge Ward indicated that although the increased burdens on the City as a result of including kinship foster care within the Decree did not justify restricting the Decree's scope, the City "might well be successful" in making a motion for modification of the Decree under Fed.R.Civ.P. Rule 60(b) and ¶ 77 of the Decree.[2] *Id.* at 534.

Judge Ward did not find the City in contempt, nor did he impose sanctions, but he directed the City "to take all appropriate steps to ensure that the protections of the consent decree are extended to children in kinship foster care." *Id.* at 535.

Appellants petitioned this Court on March 14 and March 23, 1994, for permission to appeal Judge Ward's order pursuant to 28 U.S.C. § 1292(b). Permission was denied on May 3, 1994. Appellants then filed Notices of Appeal, asserting appellate jurisdiction under 28 U.S.C. §§ 1291 or 1292(a)(1). On June 21, 1994, this Court referred Plaintiffs' motion to dismiss the appeal on jurisdictional grounds to the panel hearing the appeal on the merits.

## Discussion

This appeal illustrates how resolution of a jurisdictional issue can sometimes turn on the merits of the ruling sought to be appealed. We begin by rejecting 28 U.S.C. § 1291 as a basis of jurisdiction. Because Judge Ward's order was issued in the context of a pending contempt motion, and there has not been a finding of contempt, much less an assessment of sanctions, the order is not "final." *See Dove v. Atlantic Capital Corp.,* 963 F.2d 15, 17–18 (2d Cir.1992).

However, whether the order is appealable under 28 U.S.C. § 1292(a)(1) as a modification of an injunction is a closer question because, although Judge Ward believed that he was interpreting and ordering compliance with the Decree's "clear and unambiguous language," 153 F.R.D. at 534, appellants plausibly argue that his interpretation was erroneous and resulted in a modification of the Decree. *See United States v. O'Rourke,* 943 F.2d 180, 186 (2d Cir.1991); *Motorola, Inc. v. Computer Displays International, Inc.,* 739 F.2d 1149, 1155 (7th Cir. 1984). In order to determine whether the ruling modifies the Decree, we must assess its merits because if the Judge correctly construed the Decree, he did not modify it, but if he erred in his construction, he did modify it. In assessing his interpretation, we apply *de novo* review. *See O'Rourke,* 943 F.2d at 186.

Appellants do not deny that kinship foster children are within the foster care system, notwithstanding any differences under state law between kinship and non-kinship foster homes—differences that the District Court considered "of degree, not of kind." 153 F.R.D. at 531 n. 13. Like other foster chil-

---

**2.** Paragraph 77 of the Decree provides that "[i]n the event that the City defendants ... believe that any provision of this agreement is unworkable or unnecessarily burdensome or that a change in circumstances or unforeseen obstacles have made a modification of any of its provisions appropriate ..., they shall notify the parties to this agreement." The parties "shall meet thereafter and make a good faith attempt to negotiate a modification of this agreement," and "[i]n the event that the parties are not able to reach agreement, City defendants ... shall have the right to petition the court for modification." *Id.*

dren, kinship foster children are subject to governmental control with respect to placement and supervision, and thus fall within the category of children "whose placement in foster care is the responsibility of the New York City Commissioner of Social Services." Decree, ¶ 4.

Nor can appellants plausibly dispute that certain language of the *Wilder* Decree appears to embrace "all" foster children, without exclusion. Specifically, ¶ 4 describes the coverage as *"all* New York City children whose placement in foster care is the responsibility of [the City]" (emphasis added), while ¶ 22 provides that the City "shall refer *all children for placement* in accordance with the terms of this Stipulation" (emphasis added), and ¶ 25 further provides that "*all children* shall be placed with foster boarding home *families appropriate for their needs* " (emphasis added).

Nevertheless, appellants contend that the *Wilder* Decree does not cover kinship foster care placement and that we should interpret the Decree's all-inclusive language narrowly in this context because: (1) kinship foster care did not exist when the Decree was negotiated and approved and, therefore, the parties could not have intended to cover it; (2) kinship foster care has nothing to do with eliminating racial or religious discrimination, which was the purpose of Plaintiffs' lawsuit; (3) the Decree is inconsistent with state laws governing kinship care and will interfere with kinship placement; and (4) the failure of Plaintiffs and Intervenors to object sooner to the City's post–1985 practices regarding kinship foster children indicates that the Decree was never understood to include kinship foster care. We do not find these arguments, considered separately or collectively, to be sufficiently compelling to override the Decree's express terms.

First, although kinship foster care did not exist in its present form in 1984, a small number of children were being placed with relatives under the direction of CWA; the City was seeking to convert informal caretaker arrangements with relatives into formal foster care status; courts were construing foster care to include placement with relatives; and proposed state regulations relat-

ing to kinship foster care placements were being discussed with the City. *See, e.g., Matter of Gravina,* 89 A.D.2d 534, 452 N.Y.S.2d 612 (1st Dept.1982); *Matter of Curtis H.,* 112 Misc.2d 460, 469, 446 N.Y.S.2d 986, 991 (Fam.Ct.N.Y.Cty.1982); *Matter of Lucinda G.,* 122 Misc.2d 416, 420, 471 N.Y.S.2d 736, 739 (Fam.Ct.Del.Cty.1983); N.Y.Comp.Codes R. & Regs., tit. 18, § 443, 444 (1985).

The City could have anticipated some form of kinship foster care, though the City probably could not have anticipated the tremendous increase in kinship foster care placements in the late 1980s. But even if kinship foster care appeared only after the Decree was finalized, appellants do not contend that the Decree is inapplicable to all new programs the City might create to serve the changing needs of children entering the foster care system, and it is implausible that the City could limit the Decree's reach and dilute its impact merely by establishing new kinds of foster care.

Second, we reject appellants' contention that because the original lawsuit alleged racial and religious discrimination, we should limit the reach of the Decree to those children actually or potentially disadvantaged by racial or religious discrimination. Appellants assert that racial and religious discrimination is unlikely to be a factor in deciding to place children with their own relatives, and that children do not compete for placement in kinship homes because, unlike non-relative foster boarding homes or agency programs, kinship foster homes are not certified in advance to care for non-related children or selected from an agency's list of program vacancies. Appellants also observe that a number of provisions in the *Wilder* Decree were designed to eliminate discrimination in agency and foster boarding home placements.

But, as the District Court observed, "[c]onsent decrees can properly contain relief that may benefit nonvictims of the harms alleged in the underlying lawsuit." 153 F.R.D. at 530. In light of the broad definition of foster care and of those children covered by the Decree, we are unpersuaded by the argument that we should interpret the Decree

entirely in light of Plaintiffs' allegations. *Cf. Kozlowski v. Coughlin,* 871 F.2d 241, 245 (2d Cir.1989) (" 'Having entered into the consent decree rather than bringing the dispute ... to trial, [the Commissioner] cannot · now evade an integral portion of that decree on the· ground that it was not directly tied to a federal claim.' ") (quoting trial court). ·

Moreover, the City concedes that the *Wilder* Decree extends to non-kinship foster children who were not victims of. discrimination. The initial draft of the Decree was revised; largely due to the input of Intervenors, to cover not only the voluntary agency programs but also CWA's direct care programs, even though the City's programs were not alleged to be involved in discrimination. *See also Wilder v. Bernstein,* 645 F.Supp. at 1304 (Decree's "terms apply generally to the range of child care facilities and programs funded by [CWA], including the City's own direct care program"). We see no reason to distinguish kinship foster care, which was a direct care program at the time the Decree was signed, from the non-kinship direct care programs, and appellants have offered none.

Third, appellants' claim that the terms of the Decree are incompatible with state laws regulating kinship foster care is unsupported. New York Social Services Law § 384–a(1–a) (McKinney 1992) provides that the City shall "determine whether the child may appropriately be placed with a suitable person related to the child." *See also* N.Y.Fam.Ct.Act § 1017 (McKinney 1983 & Supp.1993). Paragraph 25 of the Decree, which deals · only with foster boarding. home placement, provides that "[p]ursuant to SSC [now CWA] policy, all children shall be placed with foster boarding home families appropriate for their needs." There is no necessary inconsistency here. Placement with relatives will generally be "appropriate" for the foster child's needs under both state law and the Decree, particularly if the. Decree's other provisions—discussed below—regarding selection of agency programs, evaluation of children, and supervision of foster homes are applied to kinship foster children.

Appellants point out that the *Wilder* Decree requires 30–day evaluations (Decree, ¶ 48), while state kinship foster care regulations permit evaluations to be completed within 60 to 90 days, *see* N.Y.Comp.Codes R. & Regs., tit. 18, § 443.7 (1988). In addition, the *Wilder* Decree requires placement in the "best available" agency program (¶¶ 23, 24), while state law simply requires placement in an appropriate relative's home without regard to the appropriateness of the agency assigned to monitor the kinship foster home and provide needed services. As noted earlier, CWA currently supervises most kinship foster care placements.

Yet, appellants do not explain why the *Wilder* Decree· is incompatible with kinship foster care merely because it offers some benefits to kinship foster children greater than those available under state law. The state regulations pertaining to evaluations do not suggest that competent evaluations to determine a kinship foster child's service needs cannot be done within 30 days of placement, and, indeed, the City is obligated under the Decree to complete such evaluations with respect to non-kinship children. Nor does the City indicate how requiring placement with the "best available" agency program will undermine kinship foster care.

Appellants believe they detect some hostility on the part of the Plaintiffs—or, more precisely, the American Civil Liberties Union, which represents the class—toward kinship foster care and the state kinship foster care laws, and suggest that the attempt to bring kinship foster children within the terms of the Decree is motivated by a desire to restrict kinship foster care. But the attitude of Plaintiffs or the ACLU toward kinship foster care is irrelevant to our analysis. It is Judge Ward, and not the Plaintiffs or the ACLU, who is ultimately responsible for overseeing and interpreting the Decree, and although the Plaintiffs–Intervenors (represented by the Legal Aid Society) appear to assume that applying the Decree to kinship foster children will be counterproductive, there is no reason to anticipate that Judge Ward will now act against the best interest of the children or arbitrarily seek to frustrate kinship foster care by requiring that children be placed in anonymous homes rather than with relatives.

Finally, there is little merit to appellants' "practical construction" argument premised on Plaintiffs' and Intervenors' delay in protesting the City's failure to extend the Decree to kinship foster care. The City's longstanding non-compliance with other provisions in the Decree also did not prompt an immediate contempt motion from Plaintiffs, and it is far from clear that either Plaintiffs or Intervenors were fully informed of the City's unilateral decision to excise kinship foster children from the Decree. But even if we assume an inordinate delay in Plaintiffs' objection to the City's policies, the language and scope of the Decree still strongly support inclusion of kinship foster children.

In the end, appellants, by trying to interpret the Decree to exclude kinship children, are the ones seeking "a modification in the guise of construing a consent decree." 153 F.R.D. at 534. Yet, in view of the lenient standards for modification of consent decrees in the context of institutional reform litigation, *see Juan F. v. Weicker*, 37 F.3d 874, 878 (2d Cir.1994); *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 381–85, 112 S.Ct. 748, 759–60, 116 L.Ed.2d 867 (1992), the express provisions in the Decree relating to modification, and Judge Ward's statement that he might be receptive to a motion for modification, it does not strike us as unfair to hold the City to its original bargain, and the terms of the Decree, at this stage. If there has been a "significant change in circumstances, factual or legal," *Juan F.*, 37 F.3d at 878, that makes continued inclusion of kinship foster children within the Decree inappropriate for those children or unduly burdensome to the City, this might be a basis for modification.

But the only question now before us—which goes ultimately to the issue of appealability—is whether the *Wilder* Decree as written covers kinship foster children. Because the Decree was structured to include all foster care children within its scope, we conclude that Judge Ward's construction was proper. Moreover, we agree with Judge Ward that the unambiguous language of the Decree and the voluminous record already available to us make a hearing unnecessary. Because the District Court interpreted rather than modified the *Wilder* Decree, there is no jurisdiction for this appeal under 28 U.S.C. § 1292(a)(1).

### Conclusion

The appeal is dismissed.